# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 10, 2016   Decided July 7, 2017

No. 15-1295

NATIONAL ASSOCIATION OF TELECOMMUNICATIONS OFFICERS
AND ADVISORS, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AMERICAN CABLE ASSOCIATION AND NATIONAL CABLE &
TELECOMMUNICATIONS ASSOCIATION,
INTERVENORS

———

On Petition for Review of an Order of
the Federal Communications Commission

———

*Stephen B. Kinnaird* argued the cause for petitioners. With
him on the briefs were *Rick. Kaplan* and *Jerianne Timmerman*.

*James M. Carr*, Counsel, Federal Communications
Commission, argued the cause for respondents. With him on
the brief were *William J. Baer*, Assistant Attorney General,
U.S. Department of Justice, *Robert B. Nicholson* and *Steven J.
Mintz*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal
Communications Commission, *David M. Gossett*, Deputy

General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, and *Maureen K. Flood*, Counsel, entered an appearance.

*Matthew A. Brill*, *Matthew T. Murchison*, *Jonathan Y. Ellis*, *Matthew J. Glover*, *Jeffrey Alan Lamken*, *Rick C. Chessen*, *Michael S. Schooler*, and *Diane B. Burstein* were on the joint brief for intervenors in support of respondents.

Before: HENDERSON and PILLARD, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*:  In 2015, the Federal Communications Commission reversed a decades-old, rebuttable presumption that determined whether state and local franchising authorities may regulate cable rates. *Concerning Effective Competition; Implementation of Section 111 of the STELA Reauthorization Act*, 80 Fed. Reg. 38001 (2015) (the Order) (to be codified at 47 C.F.R. pt. 76).  The National Association of Telecommunications Officers and Advisors, the National Association of Broadcasters, and the Northern Dakota County Cable Communications Commission petition for review of the Order as an impermissible construction of the statute and as arbitrary and capricious.  We deny their petition.

## I. Background

The Cable Television Consumer Protection and Competition Act of 1992 (the Cable Act), which amended the Communications Act of 1934,  authorized the Commission to certify a state or local franchising authority to regulate the rates for basic cable service charged by any cable system that it

"finds" is "not subject to effective competition." Pub. L. No. 102-385, § 3, 106 Stat. 1460, 1464 (codified at 47 U.S.C. § 543); § 543(a)(2). The Order addresses the procedures to be used by the Commission to find a cable system is subject to the type of effective competition defined in § 543(*l*)(1)(B), which the Commission calls "Competing Provider Effective Competition." *See* 80 Fed. Reg. at 38001/3. Competing Provider Effective Competition is one of the four types of "effective competition" defined in the Communications Act; the Order does not affect the procedures for finding any of the other three types of effective competition. *Id*. at 38006/1.

Competing Provider Effective Competition has two requirements: (i) the franchise area is "served by at least two unaffiliated multichannel video programming distributors [MVPDs[*]] each of which offers comparable video programming to at least 50 percent of the households in the franchise area"; and (ii) "the number of households subscribing to programming services offered by [MVPDs] other than the largest [MVPD] exceeds 15 percent of the households in the franchise area." § 543 (*l*)(1)(B)(i) and (ii).

When it first implemented the Cable Act, the Commission adopted a rebuttable presumption that cable operators were not subject to effective competition. *Implementation of Sections of the Cable Television Consumer Prot. & Competition Act of 1992 Rate Regulation*, 8 FCC Rcd. 5631, 5669-70 (1993) (1993 Order). A cable operator that wanted to avoid rate regulation bore the burden of proving it was subject to effective competition. *Id*. The cable operator or an "other interested party" could "petition" the Commission to "revoke the jurisdiction of such authority." § 543(a)(5).

---

[*] MVPDs, which provide video programming directly to subscribers, include direct broadcast satellite (DBS) services.

In the Order under review, the Commission, citing a changed competitive landscape, reversed the presumption. *See* 80 Fed. Reg. at 38001-02. Under its new Order, the Commission presumes there is Competing Provider Effective Competition and places the burden upon the franchising authority that wants to regulate basic cable rates to prove there is not effective competition in its area. *Id.* The Order also, with certain narrow exceptions not relevant here, automatically, i.e. without receiving a petition from the affected cable operator or any other "interested party," terminated previously issued certifications of no effective competition. *Id.* at 38008.

The Commission based its authority to promulgate the Order primarily upon § 623 of the Communications Act, 47 U.S.C. § 543, as it was before the changes dictated by the STELA Reauthorization Act of 2014 (the STELAR Act), Pub. L. No. 113-200, § 111, 128 Stat. 2059, 2066 (codified at 47 U.S.C. § 543(o)), which further extended the Satellite Television Extension and Localism Act of 2010 (STELA), Pub. L. No. 111-175, 124 Stat. 1218. *See* 80 Fed. Reg. at 38005. The Order would implement the STELAR Act insofar as it requires the Commission to "establish a streamlined process for filing of an effective competition petition pursuant to [§ 543] for small cable operators." 47 U.S.C. § 543(o)(1); 80 Fed. Reg. at 38005. The STELAR Act also provides that "[n]othing in this subsection shall be construed to have any effect on the duty of a small cable operator to prove the existence of effective competition under this section." § 543(o)(2). The Commission reasoned that the Order fulfilled the requirements of the STELAR Act because it "establish[ed] a streamlined process for all cable operators, including small operators, by reallocating the burden of providing evidence of Effective

Competition in a manner that better comports with the current state of the marketplace." 80 Fed. Reg. at 38005/1.

In the Order, the Commission describes how market conditions had changed since it erected the original presumption in 1993. 80 Fed. Reg. at 38002-04. For example, in 1993:

> Incumbent cable operators had captured approximately 95 percent of MVPD subscribers. In the vast majority of franchise areas, only a single cable operator provided service and those operators had "substantial market power at the local distribution level." DBS service had not yet entered the market, and [phone companies] had not yet entered the MVPD business in any significant way.

*Id*. at 38002/1-2 (quoting *Implementation of Section 19 of the Cable Television Consumer Prot. & Competition Act of 1992*, 9 FCC Rcd. 7442, 7449 (1994)).

Today, however, the Commission found two unaffiliated DBS providers each offer "comparable video programming" to almost all homes in the United States. *Id*. at 38002-03. The Commission determined that fact alone "presumptively satisfies" the first part of the Competing Provider Effective Competition test for all franchise areas. *Id*. at 38003.

The Commission found the second part of the test was likely satisfied for most franchise areas because, in the nation as a whole, "competitors to incumbent cable operators have captured approximately 34 percent of U.S. households, or more than double the percentage needed to satisfy the second [part] of the competing provider test." *Id*. at 38003/3. In addition, the Commission cited evidence submitted by the National

Cable and Telecommunications Association that subscription to providers other than the largest MVPD exceeded 15% in all 210 Designated Market Areas in the United States, *id.*, though, as the Commission acknowledges in its brief, Designated Market Areas are not the same as the "franchise area[s]" specified in the Communications Act.

## II. Analysis

The Petitioners challenge the Commission's rulemaking as an impermissible interpretation of the Communications Act. The Petitioners also challenge the presumption of effective competition as arbitrary and capricious.

## A. Consistency with the Communications Act

Because here the Commission exercised the authority delegated to it by the Congress "generally to make rules carrying the force of law," *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), we must decide whether the Order implements "a lawful construction of the … Act under *Chevron*," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974 (2005) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980.

The Petitioners contend the new presumption of effective competition and the Commission's termination of previously issued certifications violate the Communications Act for three reasons. First, they say the Commission's procedures do not fulfill the prerequisite to rate deregulation that the Commission

"finds … effective competition" in each individual "franchise area." § 543(a)(2) & (*l*)(1)(B). Second, they challenge the Commission's authority to revoke a previous certification without a petition from "a cable operator or other interested party," as contemplated by the Communications Act. § 543(a)(5). Third, the Petitioners argue the Commission's rule violates the STELAR Act by entirely eliminating the petitioning process, instead of "establish[ing]" the "streamlined process" required by that statute. § 543(o)(1).

## 1. The presumption

The Petitioners argue the Communications Act unambiguously requires the Commission to use franchise-specific evidence – not a rebuttable presumption based upon nationwide data – because it requires that the Commission "find[]" Competing Provider Effective Competition based upon actual conditions "in the franchise area." § 543(a)(2) & (*l*)(1)(B).

As a preliminary matter, we agree with the Commission's assertion that it did not rely solely upon nationwide data in finding franchise areas are now subject to effective competition. The Commission first gave each franchising authority an opportunity to rebut the presumption before finding effective competition in its franchise area. 80 Fed. Reg. at 38004/2. Contrary to the Petitioners' assertion, that procedure meets the requirement, in their words, that the Commission make "the determination of effective competition ... on the basis of a franchise area."

Even so, the Petitioners challenge the permissibility of the Commission's reliance upon "the *absence* of any relevant franchise-area evidence." We agree with the Commission that its new procedure cannot be properly characterized as having

"no evidentiary foundation"; instead, the Commission relied upon evidence that the "vast majority" of franchise areas face effective competition. Petitioners also argue the failure of a franchising authority to refile a certification request that rebuts the new presumption is not evidence of effective competition because a franchising authority may fail to act for a variety of reasons unrelated to competition. The Commission acknowledged "that some franchising authorities have limited resources," a situation the agency acted to mitigate by "ensur[ing] that franchising authorities will have access to the information needed to demonstrate a lack of Competing Provider Effective Competition." 80 Fed. Reg. 38007-08. In sum the Commission has provided ample evidence that the great majority if not all franchise areas now have the benefit of effective competition, and that any others will have the opportunity and ability to make themselves known. *See* 80 Fed. Reg. at 38002-04. And, as the Commission points out, "[f]ranchising authorities have a powerful incentive to come forward with such evidence: the desire to preserve their jurisdiction over cable rates." In the absence of stronger evidence that the costs of filing or other administrative burdens are preventing franchising authorities from rebutting the presumption, the Commission's inference that there is effective competition in any franchising authority that did not file a new certification form is entirely reasonable under these circumstances.

The Petitioners also contend more broadly that the Commission may not, by erecting a presumption, ignore the statutory requirement that it make franchise-specific findings. We agree with the Commission, however, that the "Congress did not speak directly to the permissibility of presumptions" merely because it used the term "finds" in § 543. A finding of fact may be a "conclusion by way of reasonable inference from the evidence." *See Beech Aircraft Corp. v. Rainey*, 488 U.S.

153, 164 (1988) (defining "finding of fact") (quoting BLACK'S LAW DICTIONARY 569 (5th ed. 1979)).  Here the evidence is that DBS services are in fact available to households in all areas, from which the Commission has reasonably inferred there is likewise effective competition in all areas.  Instead of leaving it at that, however, because the statute operates on an area-by-area basis, the Commission has made that inference rebuttable with respect to any individual franchise area.

The cases upon which the Petitioners rely to show a presumption is categorically inadequate to fulfill a statutory requirement to make a finding of fact are inapposite.  In *United Scenic Artists v. NLRB* we invalidated the presumption not categorically but because, we said, it "simply does not follow from the premise" and could be "overcome only in extraordinary circumstances."  762 F.2d 1027, 1035 (D.C. Cir. 1985) (internal quotation marks omitted).  In contrast, here the Commission has grounded its presumption in strong evidence of market conditions and facilitated rebuttal where the facts may warrant it.  *Cerrillo-Perez v. INS* is likewise unhelpful to the Petitioners because the presumption rejected in that case was "of doubtful validity" and worked as "a *per se* exclusion of a relevant factor" that entirely "relieve[d] [the agency] of its duty to consider applications on an individual basis."  809 F.2d 1419, 1426 (9th Cir. 1987) (disapproving presumption that young children of illegal aliens would always leave with their parents upon their parents' deportation).  The presumption at issue here has none of those infirmities.

The Petitioners also claim the Commission "abdicate[d] its statutory duties" by relying upon franchising authorities to come forward with the relevant facts about market conditions: "The Commission must see to it that the record is complete.  The Commission has an affirmative duty to inquire into and consider all relevant facts."  *Scenic Hudson Preservation*

*Conference v. Fed. Power Comm'n*, 354 F.2d 608, 620 (2d Cir. 1965). The Commission, however, did not "sit back and place the responsibility for initiating or carrying through essential inquiries on private parties." *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 886, 905 (D.C. Cir. 1973) (internal quotations marks omitted). On the contrary, it thoroughly investigated the state of the national market, found effective competition prevalent, and "took reasonable steps to assist the development of a meaningful record" with respect to any local market that a franchising authority identified as a potential exception to the nationwide pattern.

The Petitioners also maintain the Commission's new presumption is not justified by any "reasons of exigency" of the sort that supported adoption of a "simple, streamlined process" for approving certifications of franchising authorities in 1993; the Commission did not face a 30-day statutory deadline, as it did in 1993, to make findings of fact for all franchise areas. *See* 1993 Order, 8 FCC Rcd. at 5689-90. As the Commission points out, however, the current rule also responds to a time sensitive situation: Franchising authorities continue to regulate rates where there is effective competition in defiance of the "[p]reference for competition" made express in the Communications Act and to the detriment of consumers. Rate regulation of a firm in a competitive market harms consumers: Prices set below the competitive level result in diminished quality, while prices set above the competitive level drive some consumers to a less preferred alternative. *See* ALFRED E. KAHN, THE ECONOMICS OF REGULATION: PRINCIPLES AND INSTITUTIONS, VOL. I 21, 66-67 (1970).

Further, the Petitioners argue the former presumption was procedurally more reasonable than the current presumption because, in the old regime, a franchising authority had to state

it had "reason to believe that this presumption [of no effective competition] is correct," which statement the Petitioners argue is "*some evidence*" of franchise-specific conditions. *See* 1993 Order, 8 FCC Rcd. at 6069. The Petitioners once again argue that in the current regime, the Commission acts "without *any evidence* concerning the existence of effective competition in the franchise area." The Commission's procedure here, however, as in the 1993 Order, did more than simply erect a presumption; it gave each franchising authority an opportunity to rebut that presumption. Their failure to come forward to rebut that presumption is likewise "some evidence" of franchise-specific conditions.

Because the Congress has not spoken directly to the question whether the Commission may use a rebuttable presumption in lieu of case-by-case findings of fact, we analyze the Commission's decision under *Chevron* step two. Based upon the strength of its nationwide data and the opportunity it gave each franchising authority to support the opposite conclusion, we hold the Commission's use of a rebuttable presumption to comply with the statutory requirement that it make a finding on the state of competition in each franchise area is a permissible construction of the statutory requirement that the Commission "find[]" "effective competition" before terminating rate regulation. *See* § 543(a)(2).

## 2. Termination of existing certifications

The Petitioners also argue the Communications Act does not permit the Commission to terminate an approved certification that there is not effective competition in a particular franchise area without having received a petition asking it do so. For this proposition, the Petitioners rely upon § 543(a)(5), which says the Commission "shall revoke the jurisdiction" of a franchising authority to regulate cable rates

"[u]pon petition by a cable operator or other interested party" that makes the requisite showing.  For support, they quote *Christensen v. Harris County*: "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."  529 U.S. 576, 583 (2000) (alteration in original).  As in that very case, however, "that canon does not resolve this case in petitioners' favor."  *Id*.

By its terms, § 543(a)(5) requires the Commission to act in the specified circumstances; it does not in any way "limit[]" the Commission to acting only in those circumstances.  Again as in *Christensen*, this is the better reading when "viewed in the context of the overall statutory scheme."  *Id*.  As the Commission points out, because § 543(a)(2) prohibits rate regulation where there is "effective competition," the predicate in § 543(a)(5) cannot be the sole basis for terminating an outdated contrary certification.  Otherwise the Communications Act would make realization of the Congress's "[p]reference for competition" dependent not upon its agent, the Commission, but upon an interested party taking the initiative to file a petition.

Contrary to the Petitioners' assertion, our recent opinion in *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078 (D.C. Cir. 2017), does not suggest a different result.  There we held the Commission lacked authority to require that an opt-out notice be included in "solicited fax advertisements" based solely upon a statutory provision that authorized the Commission to require opt-out notices on "unsolicited fax advertisements."  *Id*. at 1082 n.1.  We rejected the Commission's suggestion "that the agency may take an action … so long as Congress has not *prohibited* the agency action in question."  *Id*. at 1082.  That is not the Commission's position here.  It is instead that its interpretation of § 543(a)(5) as non-exclusive, unlike the Petitioners' reading, is consistent with the

statutory "[p]reference for competition" and the prohibition of rate regulation where the Commission finds there is "effective competition." For similar reasons, the Petitioners' reliance on *Railway Labor Executives' Association v. National Mediation Board* is unconvincing. 29 F.3d 655, 658 (D.C. Cir. 1994) (holding the agency could not begin an investigation *sua sponte* based upon a statute authorizing it to do so "upon request of either party to the dispute"). The statute in that case did not contain a directive similar to the one in § 543(a)(2); here the Commission would defy a clear congressional directive if it continued to regulate rates after finding effective competition.

Therefore, we hold, consistent with *Chevron* step two, the Commission reasonably interpreted the Communications Act to allow, after a finding of effective competition, termination of existing certifications without having to wait for a petition of the kind referenced in § 543(a)(5).

## 3. The STELAR Act

The STELAR Act requires the Commission "to establish a streamlined process for filing of an effective competition petition … for small cable operators, particularly those who serve primarily rural areas." § 543(o)(1). According to the Petitioners, with its new presumption the Commission has not "establish[ed] a streamlined process" but rather "abolish[ed] that process altogether." The Petitioners also challenge the breadth of the rule, arguing that the statutory focus upon "small cable operators" precludes the Commission providing relief for small and large operators alike. Relatedly, the Petitioners contend the STELAR Act "ratifies" the 1993 presumption, which placed the burden of rebuttal upon cable operators, because it specifies "[n]othing in this subsection shall be construed to have any effect upon the duty of a small cable

operator to prove the existence of effective competition under this section." § 543(o)(2).

These arguments are not convincing. First, under the new rule, if it is to succeed in ending regulation of its rates, a cable operator must respond to any certification form submitted by a franchising authority that rebuts the presumption of effective competition. *See* 80 Fed. Reg. at 38005/3. As the Commission notes, "cable operators will continue to bear the burden of proof regarding effective competition." If the franchising authority is nonetheless certified to regulate rates, and the cable operator later tries again to terminate the jurisdiction of the franchising authority based upon purportedly changed circumstances, it must file a new effective competition petition asking the Commission to revoke that jurisdiction. Because the presumption was dispelled in the prior proceeding, the operator will no longer be able to invoke it. *Id.* Therefore, we agree with the American Cable Association and the National Cable and Telecommunications Association that the revised procedures are more aptly described as having been "streamlined," Intervenors' Br. at 23 (quoting § 543(o)(1)), rather than "abolish[ed]." The Congress has not spoken directly to the procedures the Commission must use in a new "streamlined process," § 543(o)(1), and the Commission's chosen procedures are a reasonable interpretation of § 543(o) under *Chevron* step two.

Second, the Congress's silence regarding large operators does not imply it prohibited the Commission from changing the process for them as well. Therefore, pursuant to *Chevron* step two, we agree with the Commission's interpretation that it had authority under the Communications Act, before it was amended by the STELAR Act, to adopt these changes. The Commission reasonably interpreted the STELAR Act to "neither expand[] nor restrict[] the scope of the Commission's

authority to administer the effective competition process." 80 Fed. Reg. 38005/2 (citation omitted). By changing the process for all, the Commission necessarily discharged its obligation under the STELAR Act to change the process for small operators.

Third, consistent with *Chevron* step two, the Commission reasonably interpreted § 543(o)(2) not to prohibit a "shift [in] the initial burden of producing evidence from cable operators to franchising authorities." Contrary to the Petitioners' assertion, there is no indication in § 543(o)(2) that the Congress specifically required cable operators to bear the burden of submitting the initial evidence. We agree with the Commission that its Order, in compliance with § 543(o)(2), does not disturb cable operators' ultimate burden of proof to establish effective competition.

For the reasons stated above, we conclude the Commission's Order is a permissible construction of the Communications Act, which we must approve pursuant to *Chevron* step two.

## B. Arbitrary and Capricious Review

The Petitioners also ask this court to quash the Commission's rule as arbitrary and capricious. A rule is arbitrary and capricious if the promulgating agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). More specifically relevant to the Petitioners' objection, an administrative body "may only establish a presumption if there is a sound and rational connection between the proved and inferred facts." *Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) (internal citations omitted); *see also United Scenic Artists*, 762 F.2d at 1034.

For the Commission to find there is effective competition in a franchise area, there must be at least two unaffiliated MVPDs each offering their services to 50% or more of the households in the area. § 543(*l*)(1)(B)(i). The Commission must also determine that at least 15% of the households in a franchise area subscribe to an MVPD "other than the largest" MVPD (a "competing" MVPD). § 543(*l*)(1)(B)(ii).

The Petitioners contend, for two reasons, that there is no rational connection between the nationwide data upon which the Commission based its presumption of effective competition in every franchise area and the actual existence of effective competition in any particular franchise area. First, they maintain the Commission must have data regarding a specific franchise area before it can reach any conclusion about competition in that area. Second, they challenge the Commission's reliance upon national data about Direct Broadcast Satellite penetration because the "national [market] share of DBS providers does not give any indication as to the DBS share in each of the 23,506 franchise areas."

The Petitioners, however, nowhere explain why the Commission was not justified in inferring that a DBS service with a nationwide footprint is necessarily available in 100%

(or, owing to terrestrial obstacles, nearly 100%) of every franchise area, thereby more than fulfilling the first statutory requirement that "at least two unaffiliated [MVPDs] each … offers comparable video programming to at least 50 percent of the households in the franchise area." § 543(*l*)(1)(B)(i). For the second statutory requirement, the Commission must find at least 15% of the households in a franchise area subscribe to a competing MVPD. § 543(*l*)(1)(B)(ii). The Commission provided evidence that the nationwide market share of competing MVPDs is 34% and the nationwide market share of DBS services alone is 25.6%. 80 Fed. Reg. at 38003/3 n.15 & 16. We agree with the Commission that this evidence, combined with the "ubiquitous" national presence of DBS providers, supports a rebuttable presumption that the 15% subscription requirement has been met. In reaching its decision, the Commission also noted that "competing MVPDs have a penetration rate of more than 15 percent in each of the 210 Designated Market Areas ('DMAs') in the United States, and most DMAs have a DBS penetration rate above 20 percent." *Id*. at 38003. These additional data show that the Commission did not simply rely upon the average penetration rates of 34% and 25.6%, as the Petitioners argue, but instead considered the actual penetration rate in much of the country. We disagree with the Petitioners that the Supreme Court's recent decision in *Tyson Foods, Inc. v. Bouaphakeo* requires a different result. 136 S. Ct. 1036, 1047-49 (2016) (holding use of a statistical average in certifying a class was permissible in part because individual data were unavailable). In that case, the Court simply did not address whether an agency may permissibly rely upon statistical evidence in creating a rebuttable presumption.

The Petitioners also point to the possibility of selection bias in the fact, upon which the Commission also relied, that "more than 99.5 percent of the [communities] evaluated" since

2013 satisfied one of the four tests for effective competition. 80 Fed. Reg. at 38003/1. The Petitioners contend "[t]he Commission discounted the possibility that cable operators were unlikely to file petitions where they lacked evidence of effective competition." Nonetheless, the 99.5% success rate adds support to the Commission's belief that the new rebuttable presumption is more closely aligned with current market realities than is the previous presumption, just as a low rate of success would detract substantially from the reasonableness of the new presumption. Further, the Commission bolstered the case for its reliance upon this statistic with evidence that the test for effective competition has been met "in the country's largest cities, in its suburban areas, and in its rural areas where subscription to DBS is particularly high," 80 Fed. Reg. at 38002/3, thereby providing reasonable assurance the effect of any selection bias is quite modest and does not make the Commission's inference unreliable, let alone irrational. *Cablevision*, 649 F.3d at 717 ("We generally defer to an agency's decision to proceed on the basis of imperfect scientific information, rather than to invest the resources to conduct the perfect study").

Finally, the Petitioners challenge the "usefulness" of the presumption, asserting that a cable operator can assemble the evidence needed to determine whether any particular franchise area satisfies both parts of the effective competition test. Perhaps so but, as the Commission correctly points out, efficiency is a valid reason to use a presumption: "A presumption is normally appropriate when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact … until the adversary disproves it." *Chem. Mfrs. Ass'n*, 105 F.3d at 705 (internal quotation marks omitted) (alterations in original). Here, in addition to being more consistent than is the old presumption with the Congress's "[p]reference for

competition," the new presumption economizes on transaction costs by aligning the Commission's rules with market realities. The costs associated with the new presumption are limited to those relatively few instances in which the facts warrant the effort to rebut it, whereas the costs associated with adherence to the old presumption would be incurred in the much greater number of instances in which it would be rebutted.

## III. Conclusion

For the reasons set out above, the petition for review is

*Denied.*